IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

BEST MEDICAL                              )
INTERNATIONAL, INC., *et al.*,            )
                                          )
    Plaintiffs,                )
                                          )
    v.                         )    Case No. 1:11-cv-1277 (GBL/TRJ)
                                          )
WELLS FARGO BANK, N.A., *et al.*,         )
                                          )
    Defendants.                )

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment. (Doc. 150.) This is a race discrimination in commercial lending case. Plaintiff corporations and an entrepreneur of color allege that Wells Fargo Bank, N.A. ("Wells Fargo") engaged in race discrimination in refusing to renew and extend commercial lines of credit and loans to the Plaintiff businesses. Specifically, Plaintiffs allege that Defendant J. Kent Thompson, a senior vice president of Wells Fargo, discriminated against the Plaintiff corporations and the entrepreneur of color based upon the individual entrepreneur's race. Plaintiffs further allege retaliation by Wells Fargo and Mr. Thompson as a result of Plaintiffs' allegations of discrimination and a state court lawsuit based on such allegations. The issue before the Court is whether Plaintiffs present sufficient evidence to demonstrate a genuine issue of material fact regarding its claims that (1) Defendants engaged in discriminatory lending practices based on race and (2) Wells Fargo's decision to initiate default collection procedures, including confession of judgment against Plaintiffs, amounted to unlawful retaliation. The Court holds that Plaintiffs fail to present an issue of material fact on its claim of commercial lending race discrimination because their evidence fails to demonstrate a prima facie case of discrimination, nor does

Plaintiff come forward with evidence of pretext to raise a genuine issue of fact regarding Defendants' legitimate, nondiscriminatory reasons for the adverse action denying the loan extension and loan applications. Here, the Defendants have come forward with evidence of nondiscriminatory reasons for denying extensions of Plaintiffs' loans—that is, that the Plaintiffs lack of qualifications, the Plaintiffs' infirm financial condition, and the nature of commercial lending at that time all led to a commercially reasonable decision to deny Plaintiffs' applications for a commercial loan extension. The Plaintiffs have failed to come forward with any evidence demonstrating a genuine issue of fact that Defendant Wells Fargo Bank's decision to deny the loans was a pretext for race discrimination and that the proffered nondiscriminatory reasons were not Defendant Wells Fargo Bank's real reason for denying the loans. The Court further holds that Plaintiffs fail to demonstrate an issue of fact as to their retaliation claims because the evidence before the Court is insufficient to permit a reasonable jury to find a causal connection between Plaintiffs' protected activity and the Defendants' decisions to initiate collection procedures. Accordingly, the Court grants Defendants' Motion for Summary Judgment.

## I. BACKGROUND

Plaintiffs Best Medical International, Inc. ("Best Medical"), Gunston Hall Realty, Inc. ("Gunston"), Huestis Machine Corporation ("Huestis"), Best Industries, Inc., and Krishnan Suthanthiran bring this action against Wells Fargo and J. Kent Thompson, a Senior Vice President for Wells Fargo.

This action arises out of various loans and lines of credit Plaintiffs obtained from Defendant Wells Fargo's predecessor, Wachovia Bank, between 2004 and 2006. (Statement of Undisputed Facts ¶ 1 [hereinafter "SUF"], Doc. 151; Stipulation of Uncontested Facts ¶¶ 3, 6 [hereinafter "Stipulation"], Doc. 136.) In all, Plaintiffs' loans totaled approximately fifteen

2

million dollars. (Stipulation ¶ 20.) Mr. Suthanthiran, the owner of each Plaintiff corporation, personally guaranteed payment of the loans. (SUF ¶ 3; Stipulation ¶ 14, 21.) Wells Fargo merged with Wachovia on or about December 31, 2008. (*Id.* ¶ 16.) In doing so, Wells Fargo assumed obligations as the lender for all loan and guarantee agreements between Wachovia and Plaintiffs.

On May 8, 2009, Wells Fargo sent Plaintiffs a notice of default. (SUF ¶ 6; Stipulation ¶ 22.) The notice declared Plaintiffs in default for three reasons: (1) Huestis failed to provide audited financial statements; (2) Huestis failed to maintain a Debt Service Coverage Ratio of not less than 1.24-1.00; and (3) Suthanthiran failed to maintain a liquidity requirement. (*Id.* ¶ 23.) Wells Fargo also indicated that Best Medical and Gunston Hall's lines of credit had become due on March 6, 2009. (*Id.* ¶ 24.)

On July 31, 2009, the parties modified the terms and conditions of the loans by entering into a Waiver and Amendment Agreement ("WAA"). (SUF ¶ 8; Stipulation ¶ 26.) The WAA extended the loans and required payment in full of all loans by January 1, 2010. (Stipulation ¶ 26.) The WAA incorporated the terms and conditions of the prior loan documents, and thereby reserved to Wells Fargo the rights and remedies available in the event of Plaintiffs' default. (SUF ¶ 10; Stipulation ¶ 27.) Among the terms incorporated was the security interest in Plaintiffs' accounts receivable, previously granted to Wells Fargo's predecessor, Wachovia. (SUF ¶ 37.) In exchange for the waiver of default and extension, Plaintiffs agreed to provide additional collateral, maintain a minimum net income, and use their best efforts to refinance the loans. (SUF ¶¶ 12-13.) Mr. Suthanthiran, the Plaintiff entities, and companies affiliated with Plaintiffs guaranteed the Plaintiffs' obligations under the loan documents. (SUF ¶ 14.) Plaintiffs were represented by counsel during the negotiations culminating in the WAA. (SUF ¶ 9.)

After signing the WAA, Plaintiffs attempted to refinance the loans in accordance with the WAA. (SUF ¶ 15.) In late 2009, Plaintiffs sought professional assistance with applications for refinancing as well as further extension from Wells Fargo. (*Id.*) Although the parties' dispute whether Plaintiffs actually applied for financing from approximately two dozen lenders, Plaintiffs concede that they spoke with two dozen potential lenders regarding the refinancing of their obligations. (SUF ¶ 16; Pls.' Opp'n Mot. Summ. J. at 3, Doc. 188 [hereinafter "Pl.'s Opp'n"].) Ultimately, none of these lenders provided a loan or line of credit to Plaintiffs. (SUF ¶ 18.) One prospective lender, United Bank, denied Plaintiffs' application for credit, citing concerns regarding cash flow information, lack of accounting controls, and insufficient liquidity, among other reasons.[1] (SUF ¶ 19.)

On January 1, 2010, Plaintiffs' loans remained unpaid and Plaintiffs had failed to refinance the loans. (SUF ¶ 20.) Further negotiations for an extension past the January 1, 2010

---

[1] Although Plaintiffs contend this fact is in dispute, the Court takes this fact as undisputed for two reasons. First, Plaintiffs' Opposition fails to comply with the requirement that an opposition to a motion for summary judgment not only list the facts in dispute but also "cit[e] the parts of the record relied on to support the facts alleged to be in dispute." E.D. Va. Loc. R. 56(B). With respect to this fact offered by Defendants, Plaintiffs fail to cite any portion of the record offering support to their contention that this fact is actually in dispute. Rather, Plaintiffs simply argue that they were "very close to obtaining financing from United Bank before Wells Fargo issued their Subpoena Duces Tecum to United Bank on May 31, 2012" and that "there was a complete reversal in United Bank's attitude toward Best and their willingness to work with Best." (Pls.' Opp'n at 4.) Without a citation to the record supporting their argument that they were indeed close to obtaining financing from United Bank prior to the subpoena, the Court rejects Plaintiffs' position and deems Defendants' fact admitted. *See Foglia v. Clapper*, 885 F. Supp. 2d 821, 823 (E.D. Va. 2012) (deeming the defendant's facts admitted where "[p]laintiff also fail[ed] to provide record citations" supporting the position that material facts were actually in dispute); *Hadeed v. Abraham*, 265 F. Supp. 2d 614, 617 (E.D. Va. 2003) ("The Plaintiffs' proffered facts that were unsupported by citation to evidence in the summary judgment record were rejected by the Court and will not be noted in this Order.").
Second, notwithstanding the failure to comply with the Local Rules, Plaintiffs' beliefs, regardless of their truth, do not create an issue as to either the fact that United Bank declined Plaintiffs' application or the contents of United Bank's letter. For these reasons, the Court considers as undisputed the existence of United Bank's denial letter and reasons stated therein.

deadline were unsuccessful. (Stipulation ¶¶ 28-29.)  In March 2010, Wells Fargo allegedly requested the entire Wachovia loan be repaid within six months.  (2d Am. Compl. ¶¶ 52(b)(i), Doc. 77.)  Between March and June 2010, the parties continued to exchange various proposals regarding another forbearance and modification of loan terms.  (SUF ¶ 22.)  These discussions included a March 18, 2010 proposal by Mr. Thompson that would have extended the loans to October 31, 2010.  (SUF ¶ 23.)  This same proposal, sent by Mr. Thompson in March 2010, sought a cash payment of one million dollars plus additional collateral in exchange for an extension of the loan deadline.  (2d Am. Compl. ¶ 52(B)(ii); Thompson Aff. Ex. G, at 184, Doc. 151-1.)  Defendants contend that Plaintiffs rejected this extension offer.  (SUF ¶ 24.)  Plaintiffs dispute the contention that an explicit rejection occurred, yet Plaintiffs concede that on March 30, 2010, Plaintiffs, through Mr. Suthanthiran, offered instead to pay an additional $250,000 per month toward the principal, beginning April 1, 2010.  (Pls.' Opp'n at 5.)  On April 6, 2010, Wells Fargo rejected Plaintiffs' offer and reiterated that they remained entitled to exercise the loan documents' rights and remedies in the event of default.  (SUF ¶ 25.)  On April 21, 2010, Defendants sent Plaintiffs Notices of Default indicating Plaintiffs were in default of the WAA and requesting full payment of the loans by April 30, 2010.  (SUF ¶ 26; Stipulation ¶ 30.)

Plaintiffs' loans remained unpaid as of June 2010.  (SUF ¶ 28.)  As a result, Wells Fargo pressed forward in exercising its rights and remedies pursuant to the loan agreements.  On June 10, 2010, Wells Fargo approved the decision to proceed with its rights and remedies, including filing confessed judgments against the Plaintiffs.  (SUF ¶ 29.)  Wells Fargo based this decision on (1) full maturation of Plaintiffs' loans, (2) the lack of a meeting of the minds with respect to repayment terms, (3) the loans being more than ninety days past due, and (4) provisions within the loan documents granting Wells Fargo the right to initiate default remedies.  (*Id.*)  Mr.

Thompson sent Plaintiffs a letter on June 13, 2012 indicating that Wells Fargo would collect on the accounts receivable through the efforts of Receivables Control Corporation. (SUF ¶ 30; Stipulation ¶ 34.) On June 30, 2010, Wells Fargo confessed judgment against Plaintiffs, pursuant to § 1.9 of the Guaranty Agreement. (SUF ¶ 34.) On July 2, 2010 and July 6, 2010, the Circuit Court of Fairfax County entered orders confessing judgments against Mr. Suthanthiran, Gunston, and Best Medical in the sum of $12,119,254.01. (Stipulation ¶ 33.)

On June 24, 2010, Mr. Suthanthiran sent a letter to Mr. Thompson complaining that Mr. Thompson's racial discrimination against him motivated Wells Fargo Bank's treatment of Plaintiffs, acceleration of the loans, and failure to negotiate in good faith. (SUF ¶ 32; Stipulation ¶ 31.) Wells Fargo's counsel responded to this letter on July 1, 2010, denying Mr. Suthanthiran's allegations that racial animus motivated Defendants' actions. (Stipulation ¶ 32.) In August 2010, Plaintiffs sued Wells Fargo in the Circuit Court of Fairfax County for race discrimination under the Virginia Equal Credit Opportunity Act, fraud, equitable estoppel, and breach of duty of good faith and fair dealing.[2] (SUF ¶ 35; Complaint at 5-13, *Best Medical Int'l, Inc. v. Wells Fargo, Inc.*, No. 1:10-CV-988 (E.D. Va. Aug. 30, 2010), Doc. 1-1.) The Circuit Court dismissed the case with prejudice in February 2012. (SUF ¶ 36.) In doing so, the Circuit Court entered judgment in favor of Wells Fargo and against Plaintiffs in the amount of $12,119,254.01, plus $800,086.78 for attorneys' fees. (SUF ¶ 36.) The Court notes that the Plaintiffs have filed a series of lawsuits against Wells Fargo as well as and other individuals and

---

[2]    The 2010 action action was removed to this Court and subsequently remanded to the Circuit Court. (*See* Order, *Best Medical Int'l, Inc. v. Wells Fargo, Inc.*, No. 1:10-CV-988 (E.D. Va. Oct. 22, 2010), Doc. 31.)

entities associated with Plaintiffs' dire financial condition.  Each of the claims in this Court has been dismissed.[3]

Subsequent to the Circuit Court's 2012 judgment, Wells Fargo exercised its rights to take assignment of Plaintiffs' accounts receivable.  (SUF ¶ 38.)  On May 3, 2012, Wells Fargo sent a subpoena duces tecum to United Bank, one of Plaintiffs' potential lenders, requesting documents related to Plaintiffs' financial condition.  On June 13, 2012, Wells Fargo notified Plaintiffs' customers of the assignment of the accounts receivable.  (SUF ¶ 39; Stipulation ¶ 34.)  This letter further directed the customers to pay Wells Fargo directly, through its agent Receivables Control Corporation.  (SUF ¶ 39; Stipulation ¶ 34.)  On June 21, 2102, Plaintiffs sent a letter to its customers stating that (1) Wells Fargo's letter was inappropriate, (2) the matter was in dispute, and (3) the customers should continue to pay Plaintiffs directly.  (Pls.' Opp'n at 7.)

**Procedural History**

On November 22, 2011, Plaintiffs initiated this lawsuit against Wells Fargo, as successor to Wachovia Bank, alleging lending discrimination in violation of 42 U.S.C. § 1981.  (Doc. 1.)  On March 19, 2012, the Court dismissed with prejudice any claims based on events predating

---

[3]      *See* Order, *Best Medical Int'l, Inc. v. Wells Fargo Bank, N.A.*, No. 1:12-CV-957 (E.D. Va. Jan. 11, 2013), Doc. 16 (dismissing Plaintiffs' claims against Wells Fargo Bank where Plaintiffs alleged that Wells Fargo engaged in fraudulent lending because Wells Fargo should have known, in 2007, of LIBOR rate inflation not publicly disclosed until 2012); *Best Medical Belgium, Inc. v. Kingdom of Belgium*, No. 1:12-CV-471, 2012 WL 6651976 (E.D. Va. Dec. 20, 2012) (dismissing Plaintiffs' claims against a foreign nation, its commerce agency, and bankruptcy judges where Plaintiffs alleged that the foreign defendants' actions in connection with foreign bankruptcy and corporate reorganization procedures in 2012 amounted to contractual breaches, fraud, taking of property, race discrimination, and conspiracy); Order, *Best Medical Int'l, Inc. v. Receiveables Control Corp.*, No. 1:12-CV-875 (E.D. Va. Oct. 31, 2012), Doc. 20 (dismissing with prejudice Plaintiffs Best Medical and Mr. Suthanthiran's claims against Wells Fargo and its designated collection agency where Plaintiffs alleged that collection efforts in 2012, pursuant to contractually-provided default remedies, amounted to defamation and tortious interference).

July 31, 2009, the date of the WAA. (Doc. 22.) The Court further dismissed Plaintiffs'
discrimination claim without prejudice. (*Id.*)

Plaintiffs filed their First Amended Complaint on March 28, 2012. (Doc. 35.) The First
Amended Complaint alleged (1) racial discrimination and harassment in violation of § 1981 and
(2) retaliation in violation of § 1981. (1st Am. Compl. at 12-25, Doc. 24-1.) On June 26, 2012,
the Court dismissed Plaintiffs' harassment claims with prejudice and permitted Plaintiffs'
remaining claims to proceed. (Doc. 57.)

On August 20, 2012, Plaintiffs filed their Second Amended Complaint, adding Mr.
Thompson as a defendant. (Doc. 77.) Furthermore, the Second Amended Complaint sought
relief on six grounds: Count I—race discrimination by Wells Fargo; Count II—race
discrimination by Mr. Thompson; Count III—retaliation by Wells Fargo; Count IV—retaliation
by Mr. Thompson; Count V—tortious interference with contract expectancy; and Count VI—
tortious interference with prospective business advantage. (2d Am. Compl. at 23-33.) On
October 26, 2012, the Court dismissed Counts V and VI with prejudice. (Doc. No 139.)
Defendants filed the instant Motion on November 13, 2012 on the basis that no genuine issue of
material fact exists with respect to the remaining claims, Counts I-IV. (Doc. 150.)

### III. DISCUSSION

#### A. *Summary Judgment Standard of Review*

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the
moving party demonstrates that there is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

In reviewing a motion for summary judgment, the Court views the facts in the light most
favorable to the nonmoving party. *Boitnott v. Corning, Inc.*, 669 F.3d 172, 175 (4th Cir. 2012)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (citations omitted).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Anderson*, 477 U.S. at 247-48).

A "material fact" is a fact that might affect the outcome of a party's case.  *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.  *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).  Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## B. Analysis

The Court grants Defendants' Motion for Summary Judgment on all of Plaintiffs' claims. Plaintiffs fail to provide sufficient evidence demonstrating a genuine issue of material fact as to Plaintiffs' claims of lending discrimination and retaliation. As such, no reasonable juror could find evidence sufficient to rule in Plaintiffs' favor on the discrimination and retaliation claims.

### 1. No Genuine Issue of Fact as to Plaintiffs' Discrimination Claims

The Court grants summary judgment in favor of Defendants as to Plaintiffs' discrimination claims because, even in the light most favorable to Plaintiffs, the evidence fails to demonstrate either a genuine issue as to Plaintiffs' qualification for a loan or a causal connection between Defendants' actions and Mr. Suthanthiran's race.

In evaluating Plaintiffs' § 1981 race discrimination claims, the Court employs the well-known burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* analysis, initially crafted in the employment discrimination context, permits a plaintiff to prove discrimination by a three-step burden-shifting framework, where discrimination cannot be established by direct evidence.[4] *Id.* at 802; *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 n.4 (4th Cir. 2005). *McDonnell Douglas* provides three steps for demonstrating Title VII discrimination: (1) the plaintiff establishes a prima facie case of discrimination, which gives rise to a presumption of discrimination; (2) if a prima facie case is shown, the defendant bears the burden of rebutting this presumption of discrimination by offering legitimate, nondiscriminatory reasons for taking action; and (3) if a defendant does so, the burden shifts back to the plaintiff who must show, by a preponderance of the evidence, that

---

[4]     The Court notes that the Plaintiffs' arguments attempt to present their claims only through the *McDonnell Douglas* framework. Thus, the Court's analysis forgoes any discussion of direct evidence, as Plaintiff does not present such evidence and both parties focus their arguments solely on circumstantial evidence offered to support a *McDonnell Douglas* showing.

the defendant's reasons are pretextual. *Id.* at 802-04. While the *McDonnell Douglas* opinion only addressed Title VII claims of race discrimination, courts apply the burden-shifting framework to other forms of discrimination such as that based on age or gender. *See Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (assessing age discrimination claims using *McDonnell Douglas*); *Merritt v. Old Dominion Freight Line, LLC*, 601 F.3d 289, 294 (4th Cir. 2010) (applying the framework to sex discrimination claims). Courts also apply *McDonnell Douglas* to claims brought under other federal statutes directed at curbing discriminatory practices. *See, e.g., Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (applying *McDonnell Douglas* to Family Medical Leave Act claims). Pertinent to this case, the Fourth Circuit has joined other courts in applying *McDonnell Douglas* to race discrimination claims brought pursuant to § 1981. *See, e.g., Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 263 n.* (4th Cir. 2008) (citing *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004)).

As discussed below, the Court finds Plaintiffs' discrimination claims fail for three reasons. First, Plaintiffs fails to present evidence creating a genuine issue as to the existence of prima facie discrimination. Second, even assuming the evidence could lead a reasonable juror to find a prima facie case of discrimination, Defendants offer legitimate, nondiscriminatory reasons for their actions in denying further credit extensions to Plaintiffs. Third, in light of Defendants' nondiscriminatory reasons, Plaintiffs fail to demonstrate a genuine issue of material fact that Defendants reasons for refusing to extend loans or grant loans were a pretext for discrimination.

   *a. Failure to Demonstrate Prima Facie Discrimination*

The Court finds Plaintiffs' evidence insufficient to create a genuine issue of material fact demonstrating a prima facie case of race-based lending discrimination.

Generally, a prima facie case of discrimination under *McDonnell Douglas* requires a showing that (1) the plaintiff is in a protected class; (2) the plaintiff was qualified for the job or benefit he sought; (3) despite his qualifications, he was rejected; and (4) after rejecting the plaintiff, the defendant continued seeking applications for (or extending benefits to) persons of plaintiff's qualifications. 411 U.S. at 802. Considering "the fact that direct evidence of intentional discrimination is hard to come by," the prima facie element of the framework provides plaintiffs a manner by which they may "raise[] an inference of discrimination." *Diamond*, 416 F.3d at 318 (citations and internal quotation marks omitted). The framework, including the elements of a prima facie case, is intended to be flexible, subject to change to adjust for differing factual scenarios. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517 (4th Cir. 2006); *Page v. Bolger*, 645 F.2d 227, 232 (4th Cir. 1981) (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575-76 (1978)). Considering the fact that employment scenarios vary from those involving commercial lending, the Court finds it appropriate to adapt the *McDonnell Douglas* elements to better address the concerns here. To do so, it is necessary to briefly discuss how *McDonnell Douglas* has been adjusted with respect to both § 1981 claims and lending discrimination claims.

As noted above, courts apply *McDonnell Douglas* to summary judgment motions in § 1981 discrimination cases. *Lightner*, 545 F.3d at 263 n.*. Section 1981 prohibits race discrimination in forming and enforcing contracts, stating that "[all] persons...shall have the same right...to make and enforce contracts...as is enjoyed by white citizens." *Murrell v. Ocean Mecca Motel*, 262 F.3d 253, 257 (4th Cir. 2001) (quoting 42 U.S.C. § 1981(a)) (alterations in original). A prima facie case of § 1981 discrimination requires the plaintiff show (1) membership in a protected class, (2) he sought to enter into a contractual relationship, (3) he met

the requirements needed to enter into such contract, and (4) he was denied a contractual

agreement that was available to members outside the protected class. *See id.* at 257-58

(explaining prima facie requirements for discrimination in contracting for hotel

accommodations); *see also Worldwide Network Servs., LLC v. Dyncorp Int'l, LLC*, 365 F. App'x

432, 443 (4th Cir. 2010) (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir.

2007)) ("A company alleging discriminatory contract termination may carry this burden by

showing that (1) the defendant terminated a contract with it, (2) it was within a protected class,

(3) its performance under the contract met the defendant's legitimate expectations, and (4) the

defendant instead contracted with a company not in a protected class.").

Similarly, courts apply *McDonnell Douglas* to race discrimination in lending, usually

pursuant to federal statutes focused on lending practices. In *Rowe v. Union Planters Bank of

Southeast Missouri*, 289 F.3d 533 (8th Cir. 2002), the Eighth Circuit addressed discriminatory

lending in violation of the Fair Housing Act ("FHA") and the Equal Credit Opportunity Act

("ECOA"). *Id.* at 535. The *Rowe* decision explained that a prima facie case of discrimination

under either statute required the plaintiff to show "(1) she was a member of a protected class, (2)

she applied for and was qualified for a loan with the Bank, (3) the loan was rejected despite her

qualifications, and (4) the Bank continued to approve loans for applicants with similar

qualifications." *Id.* (citations omitted).   Other circuits have joined in applying the same factors in

FHA cases. *See Boykin v. KeyCorp*, 521 F.3d 202, 214-15 (2d Cir. 2008); *Boykin v. Bank of Am.

Corp.*, 162 F. App'x 837, 839 (11th Cir. 2005). In an unpublished opinion, the Fourth Circuit

applied the *Rowe* standard to ECOA claims.[5] *See Wise v. Vilsack*, No. 11-1271, 2012 WL 5359504, at *2 (4th Cir. Nov. 1, 2012).

However, the Third Circuit addressed the very particular question of lending discrimination claims under § 1981, rather than the FHA or ECOA, in *Anderson v. Wachovia Mortgage Corp.*, 621 F.3d 261 (3d Cir. 2010). The Third Circuit noted that the particular matter of defining the elements of a prima facie case of lending discrimination under § 1981—the same issue currently before the Court—was one of first impression. *Id.* at 264. In *Anderson*, three couples alleged discrimination based on the fact that Wachovia granted mortgage loans to the couples only after imposing several conditions, an act the couples alleged to be racially motivated. 621 F.3d at 264. The Third Circuit affirmed the district court's grant of summary judgment in favor of the defendants, but not before expressing disagreement with the district court's adaptation of *McDonnell Douglas* to this context, particularly the use of the "similarly situated" element. *Id.* at 271-72. The court reiterated that the "familiar framework" of *McDonnell Douglas* applied to § 1981 lending discrimination claims because the substantive elements are generally identical to Title VII discrimination elements. *Id.* at 267-68 (citations omitted). The court then identified for four elements for presenting a prima facie case of lending discrimination under § 1981. *Id.* at 275. First, *Anderson* required the ever-present element that plaintiff belong to a protected class of individuals. *Id.* Second, the court inquired as to whether plaintiff applied and was qualified for credit made available by the defendant. *Id.* Third, the court required evidence that the defendant either denied the application or approved it subject to unreasonable or overly burdensome conditions. *Id.* Finally, having engaged in an analysis discussing the inessentiality in requiring comparative evidence in lending, *see id.* at 268-69, 271-

---

[5]      The Fourth Circuit's opinion noted that it has not published an opinion on discrimination in this context. *Wise*, 2012 WL 5359504, at *2.

73, the fourth element required additional evidence demonstrating a causal nexus between the harm and the plaintiff's membership in a protected class. *Id.* at 275. This fourth element, addressing causation, replaced the often-applied requirement of demonstrating different treatment for a similarly situated individual outside of plaintiff's class. *Id.* at 273-74. The court noted that *McDonnell Douglas* never explicitly required a showing of similarly situated individuals. *Id.* at 273; *cf. Lindsay v. Yates*, 578 F.3d 407, 417 (6th Cir. 2009) (explaining that "*McDonnell Douglas* as its progeny do not require" comparative evidence in the form of similarly-situated individuals) (citations omitted). Furthermore, the Third Circuit noted that the prima facie elements were intended to be "tailored to conform 'to differing factual situations.'" 621 F.3d at 275 (quoting *McDonnell Douglas*, 411 U.S. at 802 n.13). Unlike the employment context, where a plaintiff may experience less difficulty identifying individuals with similar qualifications, skills, or years of experience, the lending process involves "discrete and varying circumstances inherent in individual loan applications and approvals." *Id.* at 273. Accordingly, the court explained, adjusting the causal element was proper because "requiring evidence of similarly situated individuals in the lending context would be overly burdensome" due to the volume of documents, confidentiality concerns, and the difficulty in identifying which applicants are similarly situated. *Id.* at 274.

The Court finds persuasive *Anderson*'s elements and its reasoning for this particular adaptation. Thus, a successful prima facie case of lending discrimination in violation of § 1981 must present evidence that (1) the plaintiff belongs to a protected class of individuals, (2) the plaintiff applied and was qualified for credit made available by the defendant, (3) the defendant either denied the application or approved it subject to unreasonable or overly burdensome conditions, and (4) additional evidence demonstrates a causal nexus between the harm and

plaintiff's membership in a protected class. The Court is persuaded by *Anderson*'s explanation regarding the difficulty plaintiffs would face in presenting lending discrimination claims were they required to unearth and present sufficient evidence to deem an individual "similarly situated". The Court opines such a task would be extremely difficult, if not impossible, for plaintiffs to successfully undertake. It is not lost on the Court that the Fourth Circuit applied the *Rowe* factors, albeit in the ECOA context, in the aforementioned *Wise* decision. However, the unpublished decision is nonbinding, as is the "sole" other Fourth Circuit opinion, on which *Wise* relies, addressing ECOA discrimination. *Wise*, No. 11-1271, 2012 WL 5359504, at *2 (citing *Crestar Bank v. Driggs*, 995 F.2d 1062 (4th Cir. 1993) (unpublished)). While this by no means requires the Court to disregard *Wise*, and it thus retains persuasive influence, for the reasons set forth above, the Court finds *Anderson*'s test to be the proper calibration of *McDonnell Douglas* for the § 1981 lending discrimination context.[6] Indeed, the entire purpose of the *McDonnell Douglas* framework is to impart an alternative method of proof and a burden that is "not onerous." *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). As *Anderson*'s analysis indicates, requiring Plaintiffs to scour the state or region for a similarly situated borrower would indeed be unduly burdensome at the prima facie stage. Accordingly, the Court adopts the *Anderson* factors as preferable to those enumerated in *Rowe* and its progeny.[7]

---

[6]     While finding *Anderson*'s test more appropriate, the Court notes that, even applying the "similarly situated" factor set forth in *Wise* and *Rowe*, Plaintiffs would fail to meet this element. Plaintiffs agree that the *Anderson* test governs this matter, and thus makes no submission of comparative evidence in support of a prima facie case. This fact notwithstanding, Plaintiffs fail to properly submit evidence of a comparative borrower before the Court, as further explained *infra* note 9.

[7]     The Court also notes that the parties agree that the *Anderson* framework applies here.

Having determined that the *Anderson* test is proper for § 1981 lending discrimination

claims, the Court applies the Third Circuit's test here and finds that Plaintiffs fail to present

evidence demonstrating a prima facie case of discrimination. Specifically, the Court finds

lacking a genuine issue of fact for the jury as to the second element, qualification for credit, and

the fourth element, a causal connection between race and Defendants' actions.

### i. *Plaintiffs Were Not Qualified for an Extension of Credit*

Plaintiffs present insufficient evidence to permit a reasonable juror to find that Plaintiffs

were qualified for a loan from Wells Fargo. Plaintiffs failed to refinance the loans or repay the

same in full as of January 1, 2010. (Weingast Dep. 70:3-6, Doc. 151-3; Suthanthiran Dep. 94:2-

4, Doc. 151-6.) This failure to honor their obligations under the WAA supports Defendants'

contention that Plaintiffs were not qualified for an extension of credit from Wells Fargo. (*See*

Defs.' Mem. Supp. Mot. Summ. J. at 10-11, Doc. 151.) Robert Martins, a financial consultant to

Plaintiffs during the time they sought refinancing, admitted that Plaintiffs' financial condition

during this time would give pause to any potential lender. (Martins Dep. 20:15-19, Doc. 151-4.)

Specifically, Plaintiffs' condition demonstrated concerns regarding cash flow, debt-to-tangible

equity ratio, and the lack of transparency in Plaintiffs' corporate structure. (Martins Dep. 21:5-

14, 47:3-14, 94:4-9.) In light of this evidence demonstrating Plaintiffs' lack of qualification for

credit, Plaintiffs fail to present any evidence that might create a dispute on this point.

Further supporting Defendants' position is evidence demonstrating Plaintiffs contacted

between fifteen and twenty-five financial institutions regarding a potential loan. (Weingast Dep.

67:19-22.) Not one of these institutions loaned money to Plaintiffs after Plaintiffs initiated talks

regarding refinancing. (Weingast Dep. 68:1-4.) Plaintiffs contend that "speaking" with an

institution is not the same as applying for credit (Pls.' Opp'n at 15), yet the evidence does not

support Plaintiffs' conclusions that their agents merely spoke with lenders. Mr. Weingast stated

that he assisted Plaintiffs in seeking refinancing of the Wells Fargo loans from various banks and

private capital companies. (Weingast Dep. 66:17-22.) Viewing this evidence in the light most

favorable to Plaintiffs requires the Court to read Mr. Weingast's testimony to demonstrate that

Plaintiffs sought financing from a variety of banks and lending institutions and Plaintiffs were

unsuccessful in securing a refinance of their loans. Further, Mr. Martins identified "four to six

banks, three mezzanine lenders and a commercial finance company" with which he exchanged

information, on Plaintiffs' behalf, in an attempt to refinance Plaintiffs' loans. (Martins Dep.

23:4-16.) Therefore, at a minimum, Plaintiffs sought refinancing from eight lenders, as Mr.

Martins indicated those institutions he mentioned were "the ones [he] remember[ed]." (*Id.* at

23:14.) As a result, Plaintiffs' narrow argument falters when balanced with the evidence before

the Court.

Plaintiffs offer additional arguments to demonstrate their qualifications, yet none reveal

an issue for the jury on this factor. Plaintiffs stress that the comparisons to other banks' denial of

credit is "a specious argument" because of the long-standing nature of Plaintiffs' relationship

with Wachovia, as well as the fact that Defendants encouraged Plaintiffs to take out the loans.

(Pls.' Opp'n at 16.) The length and depth of Plaintiffs' relationship with Wachovia, the issuer of

the original loans, does not necessarily bear upon whether Wells Fargo, Wachovia's successor as

of December 31, 2008, would carry the same policies and take the same actions that Wachovia

took toward the extension of credit on past due loans. The parties and the Court acknowledged

that the whole financial lending world fundamentally changed in 2008 with the United States'

economic meltdown and recession. The actions of Wachovia, and its likelihood to act differently

in years prior to 2009, are insufficient to present a question of fact on whether Plaintiffs were qualified for a loan from Wells Fargo.

For these reasons, Plaintiffs fail to present sufficient evidence to create a question of fact on whether Plaintiffs were qualified for credit from Wells Fargo in January 2010.

*ii. Failure to Demonstrate a Causal Nexus Between Race and Denial of Credit*

Plaintiffs also fail to present sufficient evidence of a genuine issue of fact demonstrating a causal nexus between Mr. Suthanthiran's race and Defendants' actions so that "a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent." *Anderson*, 621 F.3d at 275. In addressing Defendants' arguments on this issue, Plaintiffs offer no facts providing any inference that race bore any relation to Wells Fargo's and Mr. Thompson's decisions. *(See* Pls.' Opp'n at 17.)

Viewing the record, Mr. Suthanthiran's testimony fails to demonstrate any facts causally connecting his race and Defendants' actions. His testimony identifies three meetings with Mr. Thompson, all prior to July 31, 2009. Thus, pursuant to the Court's March 16, 2012 ruling, any statements contained therein may not be used to support Plaintiffs' claims. Even assuming the admissibility of these conversations, Mr. Suthanthiran admitted that Mr. Thompson never made any comments about race. *(See* Suthanthiran Dep. 57:7-58:20.) Mr. Suthanthiran repeatedly opined that Mr. Thompson "was mean [and] insulting," yet could not recall any racially insensitive words or comments on Mr. Suthanthiran being of Indian descent. *(Id.* at 57:7-9, 58:10-16.) Plaintiffs failed to demonstrate any facts suggesting that Mr. Thompson, a Wells Fargo Bank officer, in reviewing the Plaintiffs' loan applications or requests for extension of line of credit, referred in any way to Mr. Suthanthiran's race, color, or national origin. Without any indication of words or other actions implicating race, Mr. Suthanthiran's conclusions are

insufficient to present any causal nexus, let alone one that might infer Mr. Thompson acted with racial animus. *Cf. EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (explaining that "complaints premised on rude treatment by coworkers...are not actionable under Title VII"); *Holleman v. Colonial Heights Sch. Bd.*, 854 F. Supp. 2d 344, 353 (E.D. Va. 2012) (dismissing Title VII hostile work environment claims based on "harsh and demeaning" behavior).

Beyond Mr. Suthanthiran's subjective opinions devoid of an objective factual basis, Plaintiffs offer no additional facts connecting Defendants' actions to race. Plaintiffs simply argue that Mr. Thompson held the power over Plaintiffs' commercial loans and that, once Plaintiffs defaulted, because Mr. Thompson harbored racial animus and did not like Mr. Suthanthiran due to his color, Mr. Thompson and Wells Fargo imposed discriminatory and commercially onerous conditions on Plaintiffs' loan applications. (Pls.' Opp'n at 17.) Even assuming, without deciding, that the conditions were onerous, Plaintiffs' own statements connect the power to take these actions to Wells Fargo's lawful rights and remedies under the WAA, not any racial sentiments or motivations. Nothing beyond Plaintiffs' conclusory statements offers any connection to Mr. Suthanthiran's race.

Therefore, Plaintiffs fail to establish a genuine issue of fact demonstrating a causal nexus between race and Defendants' actions.

### b. *Defendants Offer Legitimate, Nondiscriminatory Explanations for Denying Credit*

The Court finds that Plaintiffs fail to present evidence supporting a prima facie case of lending discrimination. Even if Plaintiffs presented sufficient evidence to invoke *McDonnell Douglas*'s burden-shifting mechanism, Defendants provide no less than ten legitimate, nondiscriminatory reasons for their actions related to the refusal to provide Plaintiffs with additional credit or time for repayment after the January 2010 default. At this second stage, the

burden "is one of production, not persuasion." *Warch*, 435 F.3d at 514 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). Thus, Defendants need only produce "evidence which, *taken as true*, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable action." *Anderson*, 621 F.3d at 271 (citations omitted) (emphasis added). Legitimacy may encompass many reasons for taking action, including compliance with government mandated programs or repeated unsatisfactory performance by the individual claiming discrimination. *See id.* at 271 (finding as legitimate defendant's explanation that the allegedly onerous conditions imposed on lenders were required by Fannie Mae); *Austin v. Bd. of Ed. of Howard Cnty.*, No. ELH-10-1185, 2011 WL 6736724, at *5 (D. Md. Dec. 21, 2011) (finding legitimate defendant's proffer of plaintiff's repeated unsatisfactory job performance ratings). Defendants offer testimony of various individuals in presenting a number of reasons for each of the allegedly discriminatory acts claimed by the Plaintiffs.[8]

As to the allegedly unreasonable and overly burdensome conditions in the WAA, Defendants offer the maturation of the loans, Plaintiffs' being in default, insufficient collateral, financial distress, insufficient net worth, the negative income of Gunston and Huestis, and the granting of the previous extension. (Defs.' Mem. Supp. Mot. Summ. J. at 15.) Mr. Thompson explained that the WAA conditions were justified by Plaintiffs' insufficient sufficient cash flow and insufficient collateral. (Thompson Dep. 35:15-36:1, Doc. 151-7.) Ms. Nancy Ross

---

[8]   Plaintiffs contend that Defendants' reasons significantly rely upon Mr. Thompson's testimony, and thus would be nothing more than self-serving statements. (Pls.' Opp'n at 18.) However, each of Defendants' rebuttals to the discrimination allegations rest upon the testimony of other individuals in addition to Mr. Thompson. Even so, as Defendants correctly note, at this stage of *McDonnell Douglas*, the Court must take the proffered evidence as true because, as noted above, "the [defendant's] burden at this stage...can involve no credibility assessment." *Warch*, 435 F.3d at 514 (quoting *Reeves*, 530 U.S. at 142.); *cf. Anderson*, 621 F.3d at 271.

explained that Plaintiffs incurred both payment defaults and covenant defaults, and they were in "financial distress." (Ross Dep. 39:17-40:18, Doc. 151-8.)

As to the acceleration of the Huestis loans, Defendants highlight the default on the debt service ratio and a right to exit the relationship due to declining profits. (*Id.*) John Puckhaber indicated that a relationship could be terminated where a client holds substandard assets, such as Plaintiffs' failure to maintain the proper debt service coverage ratio. (Puckhaber Dep. 128:5-129:1, Doc. 157-2.) Furthermore, Plaintiffs' account qualified as a "criticized/classified" relationship, and such relationships would be considered "exit relationships." (*Id.* at 138:20-139:16.) Defendants also offer Steven Kohlhagen's explanation that a reason for terminating a lending relationship arises where a "customer no longer meets the bank's profitability standards." (Kolhagen Dep. 140:13-17, Doc. 157-9.)

Regarding the March 2010 notice requiring repayment within six months, Defendants present three nondiscriminatory reasons for this action. (Defs.' Mem. Supp. Mot. Summ. J. at 16.) First, Wells Fargo, as the lender, held the right to be paid on a defaulted loan as soon as possible. (Ross Dep. 103:21-22.) Also, a six-month deadline was "not only reasonable, but normal" for allowing for either repayment or negotiation on a plan for repayment. (Kohlhagen Dep. 89:8-12.) Additionally, Defendants note that the loans would reach "nonperforming status" in June 2010, which would result in more problems for Wells Fargo due to increasing risk of the loan. (Puckhaber Dep. 86:22-87:12.)

As to the requirement of allegedly unreasonable terms before granting another extension, Defendants offer four nondiscriminatory reasons for this decision. (Defs.' Mem. Supp. Mot. Summ. J. at 16.) First, Wells Fargo's extension terms were reasonable in light of the available information on Plaintiffs' finances. (Ross Dep. 71:2-7.) Second, the $1,000,000 deposit was

22

required to demonstrate a showing of Plaintiffs' good faith. (Puckhaber Dep. 95:21-96:2.) Third, higher interest rates were necessary in light of Plaintiffs' proposal to engage in research and development in lieu of repaying the debt. (Thompson Dep. 157:6-11.) Fourth, Wells Fargo's terms were justified by the typicality of demanding payment on a matured loan. (Martins Dep. 126:12-17.)

In reference to the refusal to accept Plaintiffs' offer to pay an additional $250,000 per month, Defendants state that such a proposal offered no indication of Plaintiffs' ability to pay down the debt over the long term. (Defs.' Mem. Supp. Mot. Summ. J. at 16.) Mr. Puckhaber testified that the only way to determine long-term viability is through current financial information. (Puckhaber Dep. 95:10-11.) Because a lump sum payment offers no indication of the source of funds, the $250,000 payment failed to satisfy any concerns of viability. (*Id.* at 95:8-11.) Furthermore, Ms. Ross noted that Plaintiffs' financial statements indicated an inability to afford the $250,000 monthly payments for more than six months. (Ross Dep. 70:7-13.) Without any other provisions regarding repayment when these proposed payments ceased, Wells Fargo's rejection of Plaintiffs' offer was not unreasonable. (*Id.* at 70:3-17.)

As far as demanding payment or refinancing of the loans despite Plaintiffs' timely payments in the past, Defendants indicate that past payment history does not bear on present or future payment ability. (Defs.' Mem. Supp. Mot. Summ. J. at 17.) Mr. Kohlhagen explained that lenders must "look out into the future" to determine "what is the creditworthiness of [a] customer going forward." (Kohlhagen Dep. 69:23-70:7.)

On the issue of discrimination by demanding pay-off even though the loans were fully collateralized, Defendants explain that requesting repayment is nondiscriminatory for a cash flow lender that is not in the business of owning property. (Defs.' Mem. Supp. Mot. Summ. J. at 17.)

Mr. Thompson noted that Wells Fargo is "a cash flow lender," thus repayment sources are critical and collateral loans are "insufficient." (Thompson Dep. 41:14-17.) As Mr. Kohlhagen succinctly explained, lenders "would rather have their loans repaid in cash" because "[b]anks do like to foreclose," as they are "in the business of making loans and getting repaid," not owning property. (Kohlhagen Dep. 84:3-8.)

As to Defendants' choosing not to permit Plaintiffs' representatives to speak to a person authorized to make decisions on the loans, Defendants explain that Mr. Thompson, serving as the officer of record for Wells Fargo, was assigned to Plaintiffs' loans. (Defs.' Mem. Supp. Mot. Summ. J. at 17.) Mr. Puckhaber testified to this fact and also noted that he, as Mr. Thompson's superior, remained informed of all discussions and negotiations with Plaintiffs. (Puckhaber Dep. 91:9-92:17.)

Regarding the penalty fees and interests rates requested in May 2010, Defendants assert this action was necessary in light of three considerations: (1) the customary nature of such fees, (2) the reasonableness of the fees due to the loan having matured, and (3) the fact that equity interest rates are applied to higher interest loans. (Defs.' Mem. Supp. Mot. Summ. J. at 18; Ross Dep. 98:20-99:2; Martins Dep. 60:15-21, 159:9-19.)

Defendants identify technological reasons to explain Wells Fargo's refusal to accept Plaintiffs' payments in 2011, stating that a newly installed payment system would not debit payments for matured loans. (Defs.' Mem. Supp. Mot. Summ. J. at 18; Thompson Dep. 209:16-20.)

Defendants offer four reasons as legitimate explanations for the remaining allegations regarding Defendants' refusal to extend loans, confession of judgments, and directing Plaintiffs' customers to pay Wells Fargo directly. (*Id.* at 18-19.) First, Defendants reiterate that Plaintiffs'

repeated defaults created a legitimate, race-neutral reason for denial of credit. (Kohlhagen Dep. 134:19-25.) Second, Defendants cite the aforementioned reason of Plaintiffs' insufficient cash flow. (Thompson Dep. 35:15-36:1.) Third, Defendants note Plaintiffs' failure to cure covenant violations. (Kohlhagen Dep. 134:19-25.) Fourth, Defendants explain the legitimacy of the decision to confess judgment as based upon the statutory and contractual rights under the parties' loan agreements. (Best Medical Security Agreement, Thompson Aff. Ex. A; Huestis Security Agreement, Thompson Aff. Ex. B.)

> c. *Plaintiffs Fail to Show Defendants' Nondiscriminatory Reasons are Pretextual*

In the face of Defendants' nondiscriminatory reasoning for their actions, Plaintiffs fail to present evidence of a genuine issue of fact demonstrating that Wells Fargo's reasons are a pretext for race discrimination. Initially, Plaintiffs simply state that Defendants' explanations craft "an illogical position." (Pls.' Opp'n at 19.) Plaintiffs then present a number of arguments, many of which are either irrelevant or lacking in factual support. Plaintiffs begin by arguing that "the alleged defaults are immaterial." (*Id.* at 20.) However, Plaintiffs fail to demonstrate why failure to repay a loan by an agreed upon date is somehow immaterial to whether a default permits a lender to pursue contractually and statutorily provided remedies. Then Plaintiffs argue, without providing any facts as to customary banking practices, that Defendants' response to the defaults were unreasonable. (*Id.*) Again, this position fails to explain the unreasonableness of pursuing lawful default remedies. Plaintiffs then offer additional arguments regarding the sufficiency of Defendants' investigation of Mr. Suthanthiran's discrimination allegation; the likelihood of payment by Plaintiffs after Wells Fargo confessed judgment; the treatment of a Caucasian borrower whose debt totaled less than five percent of Plaintiffs' debt; and whether Mr. Thompson, rather than a committee, directed the actions toward Plaintiffs. (*Id.* at 21-25.) Each

of these arguments is immaterial to the legitimacy of Defendants' nondiscriminatory reasons, as none of the arguments properly before the Court hold any bearing on racial animus.[9] Furthermore, none of these arguments in anyway delegitimizes the reasons Defendants assert.

For these reasons, Plaintiffs fail to meet the third step in the *McDonnell Douglas* analysis set forth in *Anderson*, and thus cannot survive summary judgment on their § 1981 lending discrimination claims.

### 2. *Failure to Provide Sufficient Evidence on Retaliation Claims*

The Court grants Defendants' Motion for Summary Judgment on Plaintiffs' retaliation claims because Plaintiffs fail to demonstrate a genuine issue of fact as to a causal connection between Defendants' action and Plaintiffs' protected activity.

Retaliation claims, like discrimination claims, are also governed by *McDonnell Douglas*'s burden-shifting framework. A plaintiff may demonstrate prima facie retaliation by showing (1) engagement in a protected activity, (2) adverse action taken against the plaintiff, and (3) a causal connection between the protected activity and the asserted adverse action. *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008). Plaintiffs fail to meet this burden with regards to both Wells Fargo and Mr. Thompson as an individual.

### a. *Failure to Demonstrate Retaliation by Wells Fargo*

The facts before the Court do not present a genuine dispute as to whether Wells Fargo's decisions to exercise its rights and remedies were causally connected to Plaintiffs' discrimination

---

[9]     The comparisons to the Caucasian borrower are not properly before the Court, and, even if they were, are unpersuasive. As Defendants argued in a separate motion, this borrower was not identified until the final day of discovery, thereby depriving Defendants of the opportunity to depose the witness, and thus evidence pertaining to this individual would not be admissible. This error notwithstanding, the circumstances of an individual with a $300,000 loan are not, without additional facts not before the Court, comparable to a group of corporations that have previously defaulted on repayment of a $15 million dollar loan and exerted signs indicative of long-term financial troubles.

complaints. Plaintiffs allege retaliation by Wells Fargo in response to both Mr. Suthanthiran's June 24, 2010 letter accusing Wells Fargo of discrimination and the August 2010 filing of a discrimination lawsuit in state court. As to Mr. Suthanthiran's June 24, 2010 letter, Plaintiffs alleged Wells Fargo retaliated by (1) filing on confessed judgments six days after the discrimination charge and (2) ignoring Plaintiffs' complaint and conducting no reasonable investigation of the matter. (2d Am. Compl. ¶ 77.) With respect to the state court lawsuit, Plaintiffs claim retaliation by (1) Wells Fargo's refusal to release collateral in April 2011 and its requirement that Plaintiffs sign another liability waiver and (2) Wells Fargo's refusal in October 2011 to accept Plaintiffs' loan payments. (*Id.* at ¶ 78.) Viewing the record before the Court, Plaintiffs fail to present any evidence linking Wells Fargo's actions to the discrimination complaints.

Regarding the actions allegedly taken in response to Mr. Suthanthiran's letter, Defendants had decided, prior to the letter, to confess judgments against Plaintiffs. Although proximity between protected activity and averse action can give rise to an inference of retaliation, the Fourth Circuit has explained that the existence of "gradual adverse actions" before the plaintiff engages in protected activity precludes any inference of retaliation. *Francis v. Booz Allen & Hamilton*, 452 F.3d 299, 309 (4th Cir. 2006); *see also Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006) (finding retaliation not possible where an employer considered eliminating plaintiff's position months prior to the protected activity); *Austin*, 2011 WL 6736724, at *7 (finding no evidence of causation, beyond temporal proximity, where plaintiff received previously negative performance evaluations during her teaching tenure).

27

Here, Defendants presented a notice to Plaintiffs indicating that as of June 15, 2010—nine days before Mr. Suthanthiran's letter alleging discrimination—Mr. Thompson received "instructions to proceed with rights and remedies" and that "steps may be taken" with two days of the notice. (Thompson Aff. Ex. L.) Plaintiffs' only response to this explanation is that the adverse action—the confession of judgment—occurred after the letter. Not having disputed the contents, meaning, or receipt of Defendants' notice, however, the Court finds Defendants' evidence critical to the issue of causation. With Plaintiffs' causation arguments resting solely on temporal proximity, the decision to pursue rights under the loan agreements, prior to Mr. Suthanthiran's letter, "[belies] the conclusion that a reasonable factfinder might find that [Wells Fargo's] activity was motivated by [Mr. Suthanthiran's] complaint[.]" *Francis*, 452 F.3d at 309.

As to the allegedly retaliatory actions taken in 2011, Plaintiffs, resting on conclusory arguments, again fail to present any evidence to create an issue of fact for a jury. As indicated in the discrimination analysis, Defendants' reasons for refusal to release collateral or accept payments in October 2011 were not related to the filing of the state discrimination lawsuit. The reasons included the unreasonable and unacceptable nature of Plaintiffs' terms of repayment, when considering that Plaintiffs' long-term ability to repay the loans remained in question. (*See* Ross Dep. 70:2-17 (discussing defendants' receipt of a statement from Plaintiffs indicating Plaintiffs would only be able to afford the $250,000 payments for five or six months); Puckhaber Dep. 90:8-11 (explaining that the $250,000 payments did not indicate viability of Plaintiffs' business and sustainability).) Plaintiffs argue that the refusal to negotiate should be considered in light of the pending state litigation at the time and Defendants' filing of a demurrer in state court. (Pls.' Opp'n at 27-28.) These bald assertions present no facts upon which a reasonable juror could find a causal connection.

*b. Failure to Demonstrate Retaliation by Mr. Thompson*

In much the same manner, Plaintiffs fail to present evidence connecting Mr. Thompson's actions with Plaintiffs' protected activity. Plaintiffs alleged Mr. Thompson retaliated in response to the November 2011 filing of this action by taking the following actions: (1) causing Wells Fargo to subpoena United Bank, a potential lender for Plaintiffs, (2) directly contacting Plaintiffs' customers with instructions to pay Wells Fargo's agent directly, (3) causing Receivables Control Corporation to contact and harass Plaintiffs' customers, and (4) choosing to collect the accounts receivable rather than foreclose on property. (2d Am. Compl. ¶85.) The evidence provides no grounds for a reasonable juror to connect these actions with any discriminatory motive rather than Defendants' rights pursuant to the agreements with Plaintiffs.

The Court finds that Defendants present sufficient evidence to support their position that Mr. Thompson's actions were nondiscriminatory, while Plaintiffs' position remains unsupported by the record. As an initial matter, the loan documents and testimony of Wells Fargo officials indicates the rights and eventual decision in 2010 to pursue remedies long before the filing of this suit. The 2010 decision to confess judgment and act of doing so undercuts any causal connection between this suit and the decision to pursue accounts receivables from Plaintiffs' customers. Furthermore, Defendants indicate not only their rights pursuant to the loan agreements but also Virginia law providing the ability to take assignment of the accounts receivable. (Thompson Dep. 237:6-238:6.) Virginia Code § 8.9A-607 permits a secured party to contact an account debtor in the event of default, take any proceeds to which the secured party is entitled, and enforce the obligations of the account debtor. Furthermore, Virginia Code § 8.9A-406 provides that an account debtor, upon proper notice, may discharge its obligation by paying the amount due to the assignee of such account. Considering these facts, no reasonable jury

29

could find any facts demonstrating that it was retaliatory motive, rather than these clearly defined rights in Virginia law and the parties' loan documents, that caused Wells Fargo and Mr. Thompson to pursue collection activities. Even aside from the inability to establish a causal nexus in the first instance, Plaintiffs fail to demonstrate a genuine issue of fact that Defendants' reasons were a pretext for discrimination, as required under *McDonnell Douglas* once Defendants provide legitimate, nondiscriminatory reasons for their actions.

Indeed, Plaintiffs concede "that Defendants had a right to collect the accounts receivables," and instead choose to challenge the logic for collecting the accounts before foreclosing on Plaintiffs' real estate collateral. (Pls.' Opp'n at 29.) Plaintiffs note that Wells Fargo's undated Problem Asset Report indicated that Wells Fargo would commence property foreclosure if Plaintiffs failed to refinance their loans by the end of February 2010. (Pls.' Opp'n Ex. 46.) However, this report existed at least twenty-one months before the filing of this suit, a conclusion reached by the fact that the report referenced February 2010 as a future time. Additionally, the report pre-dated the failed negotiations of 2010 and the state court judgment in favor of Wells Fargo against Plaintiffs. Without a more recent indicator of Defendants' position on its intentions to foreclose or collect accounts receivable, this evidence fails to demonstrate a genuine issue of fact that Defendant's legitimate reasons were a pretext for discrimination and create a triable issue of fact for trial.

As they have done with every other claim, Plaintiffs insist on telling the Court what they argue they have proven rather than pointing to any fact in the record supporting their positions. Plaintiffs' suspicions and conclusions without evidence are not sufficient to proceed beyond summary judgment.

30

## IV. CONCLUSION

The Court holds that Defendants Motion for Summary judgment must be granted in favor of Defendants on Plaintiffs' discrimination claims because no genuine issue of fact exists regarding Plaintiffs' prima facie case of commercial lending race discrimination or a demonstration of Defendants' pretext. The Court grants the Defendants' Motion as to the retaliation claims because no issue of fact exists with respect to causation.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 150) is **GRANTED**. Plaintiffs' claims are hereby **DISMISSED with prejudice**.

**IT IS SO ORDERED**.

The Clerk will enter the separate Rule 58 final judgment.

ENTERED this _29th_ day of March, 2013.

Alexandria, Virginia
3 / 29 / 2013

_____/s/_____
Gerald Bruce Lee
United States District Judge